### SECURITY INS. CO. v. SELLERS-SAMMONS-SIGNOR MOTOR CO.*
(No. 9670.)

(Court of Civil Appeals of Texas. Fort Worth. July 2, 1921. Rehearing Denied Oct. 15, 1921.)

1. **Appeal and error ⟲719(6)—Special findings of jury conclusive when error not assigned thereon.**

Special findings by the jury are conclusive where no assignments of error are addressed to such findings as being unsupported by the evidence.

2. **Insurance ⟲425—Appropriation of automobile by prospective purchaser permitted to drive it pending collection of check held "theft."**

Under Pen. Code 1911, art. 1348, defining theft by a bailee where automobile dealers permitted a prospective purchaser to take an automobile in order that he might learn how to drive it pending the collection of his check for the price or the receipt of information by them that it was good, his appropriation of the automobile amounted to "theft" within a policy insuring the dealers against theft.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Theft.]

**3. Insurance ⊜⇒646(2)—Burden on insured to show automobile had not passed out of its possession when stolen.**

Under a policy insuring automobile dealers against theft and providing that the insurance should continue until the property was delivered to a purchaser or otherwise passed out of possession of the dealer, the burden was on insured to show that an automobile for the theft of which recovery was sought had not passed out of its possession within the meaning of such provision interpreted in connection with other parts of the policy, and construed according to the rules of construction for insurance policies.

**4. Insurance ⊜⇒146(3)—Policy construed favorably to insured.**

As the language in an insurance policy is used by the insurer to express the terms and conditions upon which it issues the policy, it will be strictly construed against it, and liberally in favor of insured, and if the words admit of two constructions that one most favorable to the insured will be adopted.

**5. Insurance ⊜⇒146(1)—Language of policy to be construed according to evident intent.**

The language used in an insurance policy must be construed according to the evident intent of the parties, to be derived from the words used, the subject-matter to which they relate, and the matters naturally or usually incident thereto.

**6. Insurance ⊜⇒146(3)—Language construed to prevent forfeiture if fairly susceptible of such construction.**

Forfeitures are not favored by the law, and, if the language of an insurance policy is fairly susceptible of an interpretation which will prevent a forfeiture, it will be so construed.

**7. Insurance ⊜⇒329—Automobile delivered to prospective purchaser pending collection of check for price held not to have passed out of dealer's possession.**

Under a policy insuring automobile dealers against theft, and providing that it covered all automobiles owned by insured from time of delivery to it until the property was delivered to a purchaser or otherwise passed out of insured's possession, where the dealer permitted a prospective purchaser to take an automobile in order that he might learn to run it pending collection of his check for the price or the receipt of information as to whether it was good, the dealer *held* not to have parted with possession in view of other provisions of policy.

Appeal from District Court, Taylor County; W. R. Ely, Judge.

Action by the Sellers-Sammons-Signor Motor Company against the Security Insurance Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Etheridge, McCormick & Bromberg, of Dallas, for appellant.

Wagstaff & Wagstaff, of Abilene, for appellee.

DUNKLIN, J. E. Sellers, C. E. Sammons, and L. F. Signor, doing business as partners in the firm name of Sellers-Sammons-Signor Motor Company, recovered a judgment against the Security Insurance Company, of New Haven, Conn., for the sum of $1,627.08 for the loss by theft of an Essex automobile, and which loss plaintiffs alleged was covered by an insurance policy issued by the defendant company to the plaintiffs as automobile dealers.

Plaintiffs alleged in their petition that—

"On or about the ―― day of July, 1920, they were the owners of one certain Essex car of the value of $2,100, and that on said day and date said car was stolen from the plaintiffs and carried away and taken from the possession of the plaintiffs without plaintiffs' consent and without plaintiffs' knowledge, and plaintiffs lost said car and the total value thereof."

The proof showed that the plaintiffs were automobile dealers in the city of Abilene, Tex., and were engaged in the buying and selling of automobiles, the Essex car being one of the cars handled by plaintiffs and specifically named in the policy of insurance issued by the defendant and upon which policy the suit was based. In the policy plaintiffs' occupation or business is stated as that of "automobile dealers," and that the uses to which the automobiles insured would be put would be that of "demonstration," and the total amount of insurance was stated to be $50,000.

Under the heading, "Perils Insured Against," is the following:

"(C) Theft, robbery or pilferage, excepting by any person or persons in the assured's household or in the assured's service or employment, whether the theft, robbery or pilferage occur during the hours of such service or employment or not, and excepting also the wrongful conversion or secretion by a mortgagor or vendee in possession under mortgage, conditional sale or lease agreement, and excepting in any case other than in case of total loss of the automobile described herein, the theft, robbery, or pilferage of tools and repair equipment. * * *

"2. It is a condition of this policy that it shall be null and void:

"(A) If the automobile described herein shall be used for carrying passengers for compensation, or rented, or leased, or operated in any race or speed contest during the term of this policy. * * *

"3. This policy for and in consideration of six hundred twenty-five and no/100 dollars ($625.00) initial premium, does attach and cover all automobiles and their equipment while attached to and a component part thereof, owned by the assured from time of delivery to the assured, and to continue until said

---

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

property is delivered to the purchaser or until same otherwise passes out of the possession of the assured, but only covering within the limits of the United States or Canada as stated in the policy of which this form is a part; this period in no case extending beyond the expiration of this policy. * * *

"6. The object and intent of this policy is to cover, subject to conditions herein contained, every automobile owned by the assured, as a dealer, therefore the assured agrees to furnish this company at the inception of this contract, a true and correct inventory of all automobiles, both new and secondhand then owned by the assured as a dealer, with complete description of the said automobile, on blanks furnished by the company.

"The assured further agrees to furnish the company quarterly (first report to be filed 90 days from the attachment date of policy) during the policy period, a true and correct report of all automobiles which have been sold or otherwise disposed of during said period, such report to include a complete description of each automobile (including number and whether new or secondhand) with its storage location, the sum to be insured thereon, the date on which it became the property of the assured and the date of sale or disposal by the assured. * * *

"12. Warranted by the assured that the automobiles hereby insured will not be used for carrying passengers for compensation or rented or leased during the term of this policy, and in the event of violation of this warranty, this policy shall immediately become null and void as to the car or cars used. * * *

"14. The total premium charges as shown on each report are due and payable at the time the report is filed and the company shall retain the deposit premium until the termination of the policy, then if the actual premium shown on the final report exceeds the initial deposit premium, the difference shall be due and payable, but if the actual premium as shown on last report is less than the initial deposit premium such difference should be refunded to the assured.

"15. It is understood and agreed that all premiums under this contract shall be computed on a pro rata basis, the rate applying shall be the buildings contents rate of each location shown above (minimum rate $1.50) the minimum charge on each car to be $1.00 for cars on which the manufacturers' list price is $1,200.00 and over and $.50 on all cars listing under $1,200.00."

E. V. Sellers, one of the plaintiffs, testified upon the trial, and his testimony, together with the policy of insurance which was offered, was the only evidence introduced upon the trial. According to his testimony, a man by the name of L. A. Thedford applied to plaintiffs to buy an Essex roadster automobile. He was shown such a car, and agreed to take it giving at the time a check on a bank at Breckenridge, payable to the plaintiffs. Thereupon one of plaintiffs' salesmen went out with Thedford to teach him to drive the car, Thedford stating at the time that he desired to learn how to drive it.

During the same day the salesman and Thedford made several trips from plaintiffs' place of business, returning at intervals of a half hour or so.

With respect to the loss of the car in controversy, Sellers testified as follows:

"I will state how we lost it. There was a man by the name of L. A. Thedford came in there early one morning, and wanted to buy an Essex roadster. He says, 'I want this car equipped with cord tires; sun shade; extra tire and bumpers,' and he says, 'I want to give a check on Breckenridge.' I says, 'Well, I do not know you, Mr. Thedford,' and he says, 'Wire over there and see if it's all right.' While they were fixing up this car I sent a telegram to the Guaranty State Bank of Breckenridge, and we didn't hear anything from them, and Mr. Sammons, one of my partners, was over there, and I put in a call for him and also for the bank. We didn't hear anything that day or before morning. He wrote out a check, and I took it over to Mr. Parker, of the First State Bank.

"In the meantime, this man Thedford said he would be in town three or four days; he said the check would be all right; and he says, 'I want to learn how to drive the car while I am here,' so I could not hear from this call, and so I sent the check over to the bank and told them to send that in for collection, not to send it the usual way; just to send it direct, and in the meantime I was after the telephone operator and also to see if the telegram had been delivered, and they claimed it had been delivered. I never could get Mr. Sammons, and when the men got the car in shape one of the sales boys took this man out for a time to show him how to drive the car. He said he had never driven a car, and stated that he was a farmer boy and just wanted a car; that he had just gotten in an oil well; that he had enough money to buy it. Well I told him that it would be all right for this boy, named Dan Harkrider, to teach him to drive. Dan Harkrider was one of the salesmen. He took this man out, and was with him off and on all day, and they came back and forth to the shop every half hour or so.

"The Breckenridge dealer was there, and I asked him if he knew anything about this boy, and he said he believed he did, but he was not sure; but he said that he thought he had a well and had bought four sections of land the week before out here on the plains. This man went around and got this dealer, and he and this boy or man that was supposed to buy the car, and that afternoon he came in and asked if it would be all right if he drove the car that night; that he would come back to the garage with Mr. Driscoll. We told him that he could come in that night when Driscoll got in, but they got separated, and he left the car out in front of the hotel all night. He locked it, and left it out in front of the hotel, and early the next morning he brought it in and apologized and asked if we had heard from the telegram about his check; we told we had not, and he says, 'Well, that's strange they won't answer, because I have got the money there;' he says, 'I am not in a hurry; I will be here two or three days, and wanted to know if it would be all right for him to drive around town and

learn better how to drive it, and we told him it would be all right, provided he didn't leave town, and he said he would not. We never saw him any more, and he got up and drifted.

"That check was sent back. We got a telegram about the same time we did the check, I think the fifth day we got written information. In the meantime Mr. Sammons had come in, and I had sent him back over there before we had heard from this, and we took it up with the bank, and asked why they didn't send the telegram, and they said they had sent it as soon as they had gotten it; but it seemed there had been some delay somewhere on account of wires. He said there was no bank in Breckenridge that knew anything about him.

"As a matter of fact I never did agree to let him have the car until the check was determined to be good. It was understood that he was not to take the car away from Abilene until that check was either paid or turned down. The first day we taught him to drive it, and the next day he asked if he might take it out; that was when he left. It may have been a bluff, but when he would go to start the car off he could not get it in gear hardly. He drove past the garage once or twice, and then he left town. Our purpose in letting him have it the second day to drive around was so he could learn how to drive it. We never had accepted his money. We took his check and told him we would send it in for collection, and if it was paid he could have the car; if the bank wired and said the check was all right, why he could have it. Unless the bank wired that the check was good he could not have the car."

On cross-examination, he further testified as follows:

"On the day that the man first came we sent a man to demonstrate the car. We did not send a man out to show its points and to teach him; he had bought the car, and he wanted to learn how to drive. A demonstration is the showing up of the car to the man we are trying to interest as a purchaser. This car—he bought it without even riding in it. He came in and bought the car and gave this check. Our purpose in sending him out with our driver was not to demonstrate the car, but to teach him how to run it. Then he went out on the second day without anybody else. We were not demonstrating it at that time."

The following were the special issues submitted to the jury and the findings thereon:

"Question No. 1. Did the plaintiffs intend to part with the title of the car in controversy, at the time they delivered the same to one Thedford? Answer: No.

"Question No. 2. Did the said Thedford appropriate the car in controversy to his own use and benefit, while he had it in his possession as bailee? Answer: Yes."

[1, 2] No assignments of error are addressed to the findings of the jury as being unsupported by the evidence, and those findings therefore are conclusive. The facts so found, in connection with the uncontroverted

testimony of witness Sellers, conclusively established the theft of the automobile by Thedford within the provisions of article 1348, of the Penal Code of this state, which reads as follows:

"Any person having possession of personal property of another by virtue of a contract of hiring or borrowing, or other bailment, who shall, without the consent of the owner, fraudulently convert such property to his own use with intent to deprive the owner of the value of the same, shall be guilty of theft, and shall be punished as prescribed in the Penal Code for theft of like property."

Appellant insists that the evidence showed conclusively that before the car was stolen plaintiff had delivered possession thereof to Thedford to be used by him, and that such delivery constituted Thedford a bailee who was entitled to possession under the contract of delivery and that since the car had thus passed out of the possession of the plaintiffs before it was stolen, plaintiffs cannot recover by reason of the language used in paragraph 3 of the policy. In connection with that contention, appellant invokes the decisions of our Supreme Court in Travelers' Insurance Co. v. Harris (Com. App.) 212 S. W. 933; Coyle v. Palatine Ins. Co. (Com. App.) 222 S. W. 973, to the effect that the burden is upon the holder of such policy to show that the loss did not fall within one of the exceptions expressed in the policy of insurance.

[3-6] It is true that to entitle plaintiffs to a recovery the burden was upon them to show that the automobile had not passed out of their possession within the meaning of the language used in paragraph 3 of the policy quoted above, when such language is interpreted in connection with the other paragraphs of the policy, and the whole policy is construed according to the rules of construction of insurance policies announced by our Supreme Court in the case of Brown v. Palatine Ins. Co., 89 Tex. 590, 35 S. W. 1060, as follows:

"First. The language, being selected and used by the insurer to express the terms and conditions upon which it issued the policy, will be strictly construed against it, and liberally in favor of the insured. If the words admit of two constructions, that one will be adopted most favorable to the insured. Wood on Fire Ins., § 60; Bills v. Ins. Co., 87 Tex. 551; Goddard v. Ins. Co., 67 Tex. 71; Ins. Co. v. Hazelwood, 75 Tex. 347.

"Second. The language used must be construed according to the evident intent of the parties, to be derived from the words used, the subject-matter to which they relate, and the matters naturally or usually incident thereto. Wood on Fire Ins. §§ 182–187; Whitney v. Ins. Co., 72 N. Y. 117.

"Third. Forfeitures are not favored by the law, and, if the language used is fairly susceptible of an interpretation which will prevent a forfeiture, it will be so construed."

[7] We do not believe that the term "possession," occurring in the expression "or until same otherwise passes out of the possession of the assured," used in paragraph 3 of the policy to denote when the policy on any car would expire, should be construed as applying to and comprehending the possession which plaintiff delivered to Thedford on the morning of the day he stole the car and prior to such theft. The possession so delivered was in a very qualified and limited sense; it was intended and understood to be temporary only, with the distinct recognition of the plaintiffs' right to retake the property at any time, and at all events to be only of a temporary character.

In National Safe Deposit Co. v. Stead, 232 U. S. 58, 34 Sup. Ct. 209, 58 L. Ed. 504, the Supreme Court of the United States used the following language:

"This is one of that class of cases which illustrate the fact that, both in common speech and in legal terminology, there is no word more ambiguous in its meaning than 'possession.' It is interchangeably used to describe actual possession and constructive possession, which often so shade into one another that it is difficult to say where one ends and the other begins. Union Trust Co. v. Wilson, 198 U. S. 530, 537 [49 L. Ed. 1156, 25 Sup. Ct. Rep. 766]. Custody may be in the servant and possession in the master; or title and right of control may be in one and the property within the protection of the house of another, as in Bottom v. Clarke, 7 Cush. 487, 489, where such possession of a locked trunk was held not to include possession of the contents."

See, also, 3 Bouvier's Law Dictionary, Rawles' 3d Revision pp. 2636, 2637, for further discussion of the varying meanings of the word "possession"; also 22 R. C. L. pp. 80, 81, containing a discussion of actual and constructive possession. And on page 80 the following is said:

"The mere fact of putting one's property into the charge or custody of another does not divest the possession of the owner. The legal possession still remains in him. So one having the mere custody of another's property may commit larceny of it."

And on page 81, the following is said:

"The right of general property in chattels draws after it the right of possession."

It is true, as insisted by appellant, that a bailee of property is in lawful possession thereof in a certain sense. Edwards on Bailments (2d Ed.) 1–3; 6 Corpus Juris, par. 13, p. 1099.

But we do not believe that the expression "or until same otherwise passes out of the possession of the assured" should be interpreted as applying when the possession of the car is parted with by the owner for merely a temporary expediency, subject to be recalled at any moment, with no intention to pass title. The language used to the effect that the insurance on each car should continue until said property is delivered to the purchaser or until same otherwise passes out of the possession of the assured indicates that the possession otherwise passing should be of the same permanent character as that passed to a purchaser. Furthermore, if Thedford had not stolen the automobile that was turned over to him in order that he might learn to drive it, the plaintiffs would have been required, by paragraph 6 of the policy, to make a report of that car as being one still owned by them and still covered by the insurance policy; and under the provisions of paragraphs 14 and 15 that car, along with others, would have then been taken into account in determining the amount of premiums for insurance which plaintiffs owed to the defendant company. By paragraph C, under the heading "Perils Insured Against," it is clearly stated that theft of the automobile was one of the perils insured against and it is undoubtedly true in the present case that Thedford did steal the car in controversy. By paragraphs 2 and 12 of the policy it is explicitly stated, if any automobile which is covered by the policy is leased or rented, the insurance on that car shall be null and void. Those paragraphs in the policy would be unnecessary if the passing of possession of a car stipulated in paragraph 3 is to be given the construction insisted upon by the appellant. The fact that the insurer deemed it necessary to insert those two paragraphs indicates strongly that the contention of appellant was not in the mind of the insurer when the policy was issued.

For the reasons stated, appellant's assignments of error are overruled, and the judgment is affirmed.